# SEPTEMBER, 1932

## MIRIAM A. FERGUSON V. W. O. HUGGINS ET AL.

Motion No. 10,409.  Decided September 10, 1932.
(52 S. W.; 2d Series, 904.)

*Ocie Speer,* of Austin, and *Luther Nickels,* of Dallas, for relator.

On question of suit not being premature: Ferguson v. Maddox, 114 Texas, 85, 263 S. W., 888; Ferguson x. Wilcox, 119 Texas, 280, 28 S. W. (2d) 526; Love v. Wilcox, 119 Texas, 256, 28 S. W. (2d) 515; McPherson v. Blacker, 146 U. S., 3, 36 L. Ed., 870, 13 S. Ct., 3.

*Albert Sidney Johnson* and *M. M. Crane,* both of Dallas, *Jewel P. Lightfoot,* of Fort Worth, *Robert Lee Bobbitt,* of San Antonio, *John W. Martin, Dan Moody,* and *W. A. Keeling,* all of Austin, for respondents.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

This suit is before us on motion for leave to file a petition for mandamus. Because of the importance of the matter involved, we set the motion down for hearing and notified the parties respondent, all of whom appeared and answered, both by written pleadings and oral arguments.

The petition for mandamus is presented by Mrs. Miriam A.

Ferguson against the Chairman and Secretary and the members of the State Democratic Executive Committee. Mrs. Jane Y. McCallum, Secretary of State, in her official capacity, and Governor R. S. Sterling, in his private capacity as a candidate, were made parties respondent by the pleadings because of their relationship to the subject matter of the suit. The relator alleges in her petition that she and the respondent R. S. Sterling, together with others, were candidates before the democratic state primary election held on July 24, 1932, for the nomination of that party of its candidate for the office of governor; that at this first primary she and the respondent Sterling received the highest number of votes cast, and by reason thereof became the contending candidates at the second state democratic primary held on the 27th of August, 1932. She states that at the second primary she received approximately 4,000 more votes than her opponent, and that this fact will be shown by the statutory returns made by the county chairmen to the State Democratic Executive Committee. The purpose of this suit is to obtain the issuance of a writ of mandamus to require the State Democratic Executive Committee to canvass the returns, tabulate the votes, and certify the same to the State Convention which meets on September 13, 1932, as provided by statute. The prayer of the petition, in so far as necessary to be considered, is as follows:

"WHEREFORE, your Relator respectfully prays that this Honorable Court will make its peremptory order forthwith, commanding the Respondent Committee—its president, its secretary and each member thereof, that it will meet in the City of Lubbock on Monday the 12th day of September, 1932, and that it shall then open and canvass the returns of the second primary election of August 27, 1932, held to nominate candidates for state offices, as certified by the various county chairmen to the state chairman, and shall prepare a tabulated statement, showing the number of votes received by each candidate for Governor, in each county, and that when prepared, such statement shall be approved by the respondent committee and certified by its chairman, and further that such tabulated statement shall be by its chairman presented to the chairman of the State Convention immediately after its temporary organization on September 13, 1932.

"That in the canvassing of said returns and in the preparation of the tabulated statement showing the number of votes received by each candidate for Governor, the defendant committee will take into consideration only such matters as are

certified in the said returns by the various county chairmen and will not take into consideration, or be governed to any extent whatever, by any matters or things, whether of irregularity, fraud or other illegality or things whatsoever, not shown in said returns, as certified by the said various county chairmen."

That portion of the statute here involved reads:

"Art. 3137. * * * * "On the second Monday after the fourth Saturday in August, 1926, and every two years thereafter, the State executive committee shall meet at the place selected for the meeting of the State convention and shall open and canvass the returns of the second primary election held to nominate candidates for State offices as certified by the various county chairman (chairmen) to the State chairman, and shall prepare a tabulated statement showing the number of votes received by each such candidate in each county, which statement shall be approved by the State committee and certified by its chairman. At this meeting the State committee shall also prepare a complete list of the delegates elected to the State conventions from each county, as certified to the State chairman by each county chairman. The State chairman shall present said tabulated statement and said list of delegates to the chairman of the State convention immediately after its temporary organization on the following day, for its approval or disapproval."

■ It will be noted from the above statute that it is the duty of the State Executive Committee to open and canvass the returns of the primary election "as certified by the various county chairmen to the State chairman"; that the Committee is also to prepare "a tabulated statement showing the number of votes received by each such candidate in each county." The Chairman of the State Executive Committee is to present this tabulated statement to the Chairman of the State Convention immediately after its organization.

By Article 3138 of the statutes it is made the duty of the State Convention "to canvass the vote cast in the entire State for each candidate for each State office, as shown by the statement thereof presented to it by the State Committee." The Article also provides that the convention shall declare the candidates who have received the majority of votes cast, etc., the nominees of the party for the offices involved. This Article also makes it the duty of the Chairman and Secretary of the State Convention forthwith to certify such nominations to the Secretary of State.

In neither of the Articles to which we have referred is the

subject of contesting a primary election mentioned. This, however, is cared for by other Articles of the Statutes.

Article 3148 provides that a contest may be filed with a party executive committee in a certain manner within five days after the result of the primary election has been declared by the Committee or by the Convention.

Articles 3146 and 3147 relate to and govern the same subject.

Article 3149 provides for the opening of ballot boxes on a statutory contest.

Articles 3151, 3152, and 3153 provide for the contests of primary elections through the courts of the State.

Article 3146, previously mentioned, expressly relates to contests of primary elections based on charges of fraud or illegality in the method of conducting the elections. These contests, as previously stated, are to be instituted in the manner provided by Article 3148, within a designated number of days after the result of the primary election has been declared by the Committee or Convention.

It is obvious, we think, from these statutes, which we have but briefly referred to in this opinion, but which we have examined carefully, that the duties of the State Executive Committee are those of a canvassing board.

It is well settled by the authorities that, aside from their quasi judicial power to determine the genuineness of election returns, the functions and duties of the canvassing board are ministerial. They derive their powers from the Constitution or Statutes, and have no other powers, functions, or duties than those named. 20 Corpus Juris, p. 200, sec. 254.

Corpus Juris further states the rule:

"It is a common error for a canvassing board to overestimate its powers. Where there is no question as to the genuineness of the returns or that all the returns are before them, the powers and duties of canvassers are limited to the mechanical or mathematical function of ascertaining and declaring the apparent result of the election by adding or compiling the votes cast for each candidate as shown on the face of the returns before them, and then declaring or certifying the result so ascertained. They have no power to go behind the returns and ascertain the qualifications of the voters or otherwise inquire into the regularity of the election. Fraud, bribery, violence or other matters affecting the regularity of the election are to be passed on by the proper tribunal and not by the board of canvassers. The canvassers are not authorized to determine the

legality or illegality of the votes cast at the election; to decide upon the official title of the election officers; to entertain a contest of the election; to determine the constitutionality of a statue; to inquire into the validity of the certificates of nomination of candidates, to pass upon the eligibility of a candidate to office, to decide whether there are any vacancies in any offices, to determine what was done at an election in a previous year, or to reverse an act of their predecessors." 20 Corpus Juris, p. 200, sec. 255.

Again, the same authority in part declares:

"It is settled beyond controversy that canvassers cannot go behind the returns. The returns provided for by law are the sole and exclusive evidence from which a canvassing board or official can ascertain and declare the result. The canvassers are not authorized to examine or consider papers or documents which are transmitted to them with the returns, or as returns, but which under the statutes do not constitute part of the returns. Neither are they at liberty to receive and consider extrinsic evidence, unless the official returns are destroyed before they are canvassed, in which case secondary evidence of their contents may be received."

The authorities likewise hold that, in the absence of a statute conferring it, a board of canvassers has neither express nor implied power to recount the ballots. 20 Corpus Juris, p. 203, sec. 259.

We have previously adverted to the fact that a board of canvassers have the power to determine the genuiness of election returns. 20 Corpus Juris, p. 201, sec. 256, states the rule illustrative of this power as follows:

"Canvassers have the quasi judicial power to determine whether the papers transmitted to them are genuine election returns signed by the proper officers. Thus, where what purports to be two or more returns from the same election district are received, the canvassing board must necessarily determine from the face of the papers which one shall be regarded as the true and genuine return; but there is no room for the exercise of such discretionary power where there is before the canvassing board or official only one document which purports to be the certified abstract or return required by law. The canvassers are not required to receive or treat as a return any paper which does not appear on its face to be such a return. If a paper purporting to be a return is obviously false or a forgery the canvassers should disregard it; but if it is doubtful they must include it in the count. It is the duty of the canvassers

to receive and count all returns sent to them which are not obviously spurious, however false and fraudulent they may be in fact. Where the returns are in due form and are properly authenticated and hence are valid on their face, they cannot be rejected by the canvassers. The canvassers must decide what are the returns from the face of the papers or documents submitted to them as returns; they are not to institute any inquiries as to their authenticity."

Since the State Democratic Executive Committee is obviously a canvassing board, these elementary rules of law are applicable to it in the performance of its statutory duties. It does not follow, however, from what we have said that we should permit the petition for mandamus to be filed, or that a mandamus should issue against the Committee. The respondent State Democratic Executive Committee in its sworn answer has denied all the allegations of the petition which could be construed in effect as charges that the Committee would not canvass the returns in accordance with the statute and the rules of law which arise therefrom. After a general denial, the Committee in its answer states:

"4. For further answer, respondents allege that they and each of them, acting individually and acting collectively as members of the said State committee, intend in good faith to meet at Lubbock on the date prescribed by law, to wit, September 12, 1932, and in said meeting duly assembled to then proceed under the authority of and in compliance with the terms of R. C. S., article 3137, and in the manner prescribed by the laws of this State, to open and canvass the returns of the second primary election of the Democratic party held on August 27, 1932, to nominate candidates for State offices, including that of governor, as certified by the various county chairmen to the State chairman, and to prepare a tabulated statement showing the number of votes received by each such candidate in each county, which statement shall be approved by the said State committee, and certified by its chairman, W. O. Huggins, and shall be presented to the Chairman of the State Democratic Convention immediately after its organization on the following day. Further, in performing the above described acts and duties, these respondents shall act as prescribed by law, impartially, conscientiously and legally, uninfluenced by any threats, attempts to intimidate, or by any threatened court actions, made by the partisans of either of the candidates for nomination of the Democratic party for governor or by anyone else.

"5. That none of these respondents has heretofore ex-

pressed any intention to not canvass the returns of the said election impartially and in accordance with the laws of this State, and that none of them has committed any act in violation of the election laws of this State, or has indicated in any way that he is preparing to violate such election laws. In this connection there is no basis in fact or in law for the making of the charges against these respondents which are contained in the petition of the relator, and the said allegations are untrue."

It is thus seen that the respondents have not refused, or indicated any purpose to refuse or fail, to follow the statute governing them in the canvass of the primary election returns, and to do the very things which the relator asks that they be required to do by mandamus. On the contrary, the answer of the Committee shows a bona fide purpose and intention to comply with the statute.

■ The rule is an elementary one that a writ of mandamus will not lie to compel the performance of an act which the respondent shows a willingness to perform without coercion. 38 Corpus Juris, p. 554, sec. 24; People v. Dunne, 258 Ill., 441, 101 N. E., 560, 45 L. R. A. (N. S.) 500; Double v. McQueen, 96 Mich., 39, 55 N. W., 564; State v. Nash, 134 Minn., 73, 158 N. W., 730; Bailey v. Garvin, 280 Fed., 677; Reynolds v. Egan, 123 La., 114, 48 So., 764; St. Louis & S. F. R. Co. v. Messenger, 26 Okla., 590, 110 Pac., 893; State v. Sunset Tel. & Tel. Co., 30 Wash., 676, 71 Pac., 198.

The case of People v. Dunne, just cited, appears to be precisely in point. The action was one for mandamus against a statutory board whose duty it was to canvass the result of an election. The points made in briefs and argued by counsel for the relators were that the duties of the State Canvassing Board were purely ministerial; that a writ of mandamus might issue against the governor, who was a member of the canvassing board, to compel the performance of such duties; that the State Canvassing Board had no right to look back of the abstracts of votes and the certificates of the county canvassing boards, but should have accepted them and declared the result accordingly. That the State Canvassing Board is a permanent body, and the act sought to be held void was one which did not require a reassembling of the Board. The brief of the Attorney General, who appeared for the State Canvassing Board, made the following points, namely: That the State Canvassing Board can act only upon certified statements of the county canvassers, and had no authority to procure corrected returns or go behind the returns or receive testimony either to sustain or invalidate

them; that the duties of the Canvassing Board were purely ministerial, and that mandamus would lie to compel the Board to issue a certificate to the person having the greatest number of votes as shown by the returns; that while a writ of mandamus could not issue to control the head of an executive department in the discharge of a duty involving judgment and discretion, yet the writ could issue where the duty was merely ministerial. In discussing the case the Supreme Court of the State of Illinois held that the writ of mandamus could only issue to compel a party to act when it was his duty to act without it; that the writ would not issue to compel the doing of an act which the person sought to be coerced admits on the record he is willing to do without coercion, the court in part said:

"It will therefore be seen that there is entire agreement between the counsel for the relators and the attorney general, representing the defendants, concerning the questions of law involved; and, there being no controversy or difference of opinion between them respecting the law and the duty of the state canvassing board, there does not seem to be any necessity for calling into exercise the power of the court to coerce the defendants to do what they admit to be their duty under the law. The purpose of the extraordinary writ of mandamus is to compel the performance of a ministerial duty which one charged with the duty has refused to perform. The writ can only be issued to compel a party to act when it was his duty to act without it. It confers upon the party against whom it may be issued no new authority, and from its very nature can confer none. People ex rel. McKee v. Gilmer, 10 Ill., 242; Ottawa v. People, 48 Ill., 233; People ex rel. Peoria & R. I. R. Co. v. Cline, 63 Ill., 394. If it is the duty of the defendants to do the acts sought to be coerced by the writ, such acts would not be any more valid or legal if done under the command of the court. The office of the writ is to compel action by the unwilling. There must be a refusal to perform the act; and, if a personal right is involved, a refusal must follow a demand. *The writ will not issue to compel the doing of an act which the person sought to be coerced admits on the record he is willing to do without coercion.* People ex rel. National Cigar Co. v. Dulaney, 96 Ill., 503." (Italics ours).

Fear is expressed in the petition that the State Democratic Executive Committee might be intimidated by extrinsic forces, or that their deliberations might be interfered with through an injunction issued by some district judge. We do not think the allegations made sufficient to warrant the issuance of the writ

of mandamus against the Committee. The Committee in its answer expressly declares that in canvassing the returns it "shall act as prescribed by law, impartially, conscientiously and legally, *uninfluenced by any threats, attempts to intimidate, or by any threatened court actions* made by the partisans of either of the candidates for nomination of the Democratic Party for Governor, or by anyone else." (Italics ours).

The petition for mandamus attempts to make the State Democratic Convention, its president, secretary, and each and all the delegates and members thereof, participating and to participate, parties respondent, and contains a prayer asking for a peremptory order of this Court directing the State Democratic Convention, its president, secretary, and each and all of its delegates and members, to canvass the returns of the primary election and make statutory certificates, etc.

The State Democratic Convention thus far has no existence, has not been served, has not appeared, and is plainly not a party to this proceeding. Its president and secretary have not been elected, and the names of its delegates are not shown in the petition. None of these are parties to this proceeding, and none appeared at the argument.

Since it is apparent that the respondents, members of the State Democratic Executive Committee, have not breached any statutory duty due to the relator, and have shown clearly that they do not intend to do so, it is obvious that were we to permit the filing of a petition for mandamus, we would necessarily refuse to grant the writ. This being the state of the record, and after appearance by all parties involved and full argument, we deem it our duty to overrule the motion for leave to file, and it is accordingly overruled.

JUSTICE PIERSON not sitting.